Filed 12/30/15  Tucker v. Cunningham CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| RICK R. TUCKER,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SHALEE CUNNINGHAM et al.,<br><br>        Defendants and Appellants. | A143960<br><br>(Marin County<br>Super. Ct. No. CV1401954) |

Rick R. Tucker sued the Novato Unified School District (the District), Shalee Cunningham, the District's superintendent, and others for defamation and other causes of action after his employment as the executive director for Novato Public Access Television (NPAT) was terminated.  The District and Cunningham (collectively, defendants) filed a special motion to strike Tucker's defamation claims pursuant to the provisions of California's anti-strategic lawsuit against public participation (anti-SLAPP) statute (Code Civ. Proc., § 425.16),[1] and the trial court denied the motion on the grounds that Tucker submitted sufficient evidence to show a probability of prevailing on his two defamation claims.  Defendants appeal and we affirm.

## BACKGROUND

### NPAT's Structure and Funding

NPAT, a private nonprofit corporation formed in 2000, operates a cable television channel and broadcast facility located at offices within the District's headquarters.

---

[1] All further unspecified code sections refer to the Code of Civil Procedure.

1

Tucker served as its executive director from 2000 until his dismissal on November 21, 2013. He was the only full-time employee of NPAT; there were also three part-time employees. NPAT's broadcasts include City of Novato (Novato City) council meetings, local football games, District board meetings, and other community programming.

A seven-person board of directors (the NPAT Board), appointed by the District, Novato City council, and the Novato City manager, governed NPAT. According to Cunningham, the superintendent for the District since July 2011, the District and NPAT "have a common interest in maintaining a good working relationship between the two entities."

While Tucker was the executive director, the District acted as fiscal agent for NPAT. NPAT received payments from Comcast franchise fees equal to approximately $220,000 per year. NPAT also earned revenue from services it provided to the community. Since NPAT received public funding on a quarterly basis, it occasionally received a bridge loan from the District if NPAT's account was in the red for a short period of time prior to the arrival of the scheduled funding check. The NPAT Board approved every significant expenditure, and a Board member had to countersign any reimbursement to Tucker for NPAT purchases.

*Tucker's Employment as a Teacher*

From 1998 until 2000, the District employed Tucker as a teacher. After he became the executive director of NPAT in 2000, he worked for the District between 2002 and 2003 as a part-time instructional assistant, and as a tech aid during the 2004-2005 school year. In August 2011, Tucker began working for the District as a temporary part-time teacher at Novato High School. When hired, he did not possess a Cross-cultural, Language, and Academic Development (CLAD) Certificate, which authorizes California teachers to teach English learner (EL) students; nor did he have any other EL credential.

On September 14, 2011, Pamela Conklin, the assistant superintendent for human resources with the District, wrote Tucker a letter informing him that he lacked the credential necessary to continue employment with the District and that he needed to submit proof by November 29, 2011, of his application for a CLAD Certificate, and the Certificate needed to be completed by June 14, 2012. Conklin had at least four formal meetings with Tucker related to the requirement that he become CLAD certified.

Tucker did not attempt to obtain a CLAD Certificate and, according to Conklin, he insisted that he did not need one. Tucker had his preliminary Career Technical Education Certificate, which he claimed met all of the requirements for him to continue teaching. He maintained that the high school principal, Rey Mayoral, and assistant principal, Mark Peabody, had told him that he did not need an EL certificate since he did not have an English learner in his classroom. Tucker claimed that the District had permitted others to teach without having an EL certificate. On June 17, 2013, Peabody wrote a character reference extolling Tucker's teaching of the video program.

Conklin declared that Tucker's temporary teaching position was selected for layoff on February 28, 2013; Tucker was told of this decision on March 6, 2012. Conklin maintained that "[t]he only reason for the District's decision to terminate Tucker's employment was his failure to obtain an EL credential as required by District policy." At Conklin's last meeting with Tucker in the fall semester of the 2013-2014 school year, Conklin stated that she "had to end this meeting prematurely because of the intensity of Tucker's emotional outbursts. Tucker had put both of his hands down on the table, leaning on it and speaking in a loud, angry voice."

On June 13, 2013, Cunningham wrote an email to Don Scioli, president of the NPAT Board, asserting that Tucker was "throwing" Peter Ornstein, the person hired to replace him as a teacher, "under the bus." She claimed that Tucker was upset that he was not permitted to continue teaching without his credential.

3

***The Gun Incident and Tucker's Relationship with Bonnie Neer***

In 2013, Dave Fix worked approximately three to five days a week for NPAT, and was mentoring Bonnie Neer. Neer worked as an independent contractor for NPAT from February 8, 2013, until June 2013.

In May 2013, Tucker told Fix that he had something to show him in the District's parking lot. They went to the parking lot and Tucker showed Fix items he had inherited from his father, including a toy gun in a plastic box. It was obvious to Fix that it was not a real firearm. Neer, according to Fix, came out to Tucker's car and observed Fix and Tucker. Fix declared: "Everything was very casual during this interaction. Bonnie Neer never mentioned anything, did not appear to be upset, and did not show any concern." Fix noted that he worked with Neer later that day and numerous days after that and she never commented to him about seeing Tucker's gun.

Tucker, according to Neer, "became highly agitated" on June 11, 2013, when she told him that she had asked the District about NPAT's delay in payment of her invoices. He told her that she was not to go to the District with payment inquiries and that her services would no longer be required. Tucker's version of this event was that Neer became very angry with him when he terminated her contract with NPAT on June 11, 2013.

Neer reported that on June 17, 2013, she went to the NPAT studio to complete a final project and Tucker became angry when she told him that she needed his help to complete the project. Tucker, according to Neer, placed his hands on a chair, indicating that she should sit in it and work; he yelled at her with his face turning red. He then told her to leave the studio.

The following day, June 18, 2013, Neer met with Cunningham. Neer informed her that she saw Tucker with a gun in the parking lot of the District's headquarters. She explained to Cunningham that Tucker had recently terminated her employment "over a disagreement of a film production." Neer indicated that she had gone over a month without receiving a paycheck from NPAT for her consulting work, and believed she might have been terminated for questioning why she had not been paid.

In her declaration in support of defendants' motion to strike, Neer declared that in late May 2013, she and another NPAT employee were leaving the NPAT offices to get lunch when they encountered Tucker in the parking lot. Tucker appeared excited and told them he wanted to show them something. Tucker, according to Neer, removed a cloth and a handgun was inside. Neer declared that Tucker told them that the gun was a Nazi war pistol from his stepfather. She asserted that Tucker stated the gun was operational and he spun the chamber. Neer stated that she immediately walked away.

After Neer's disclosure about the gun incident, Cunningham called the District's security officer and the Novato Police Department.

The Novato Police Department incident report stated that the police officer spoke with Cunningham and she told him that Neer reported observing Tucker with "what appeared to be a firearm outside the school district office parking lot." The police report indicated: "Cunningham stated after having this conversation with Neer, she observed Tucker later in passing. She questioned Tucker about Neer's compensation. Tucker's reaction towards Cunningham was aggressive and he was visibly angry towards the topic being brought up. He denied Neer was ever terminated and appeared to make excuses as to why Neer had not been paid for an entire month." Cunningham described Tucker "as a 'pathological liar,' who may suffer from a mental illness or an anger management issue."

Neer told the officer that Tucker had showed her and Fix a pistol wrapped in a cloth that had been in his car. She stated that the more she thought about this incident and a comment he had made after the Sandy Hook shooting that he needed to go out and purchase rifles to protect himself, the more she became fearful for the safety of the students and staff.

Fix reluctantly spoke to the police officer. Fix "stated he recalled Tucker advising him that he had just received a bunch of items that he inherited. Tucker stated the items were in his car and he wanted Fix to look at . . . them. He went outside with Tucker and Tucker pulled out a small handgun from his vehicle. Tucker stated it was a WWII era German pistol. Fix stated the pistol was small and could fit in the palm of his hand. Fix did not believe this was a real firearm, and believed it was possibly a replica. Fix

5

remarked that he did not ask if the firearm was real, and Tucker never specifically made a statement about the gun being real. [¶] Fix stated he could not recall if Neer was present for this incident. He described Neer as being difficult to work with on projects. . . ."

The officer contacted Tucker. Tucker reported to the officer that he had inherited several items, which he brought to work. He acknowledged inheriting a German Luger pistol, but told the officer "he had already gotten rid of the firearm because his wife did not want guns in their home." He declared that he showed Fix a cap gun, not a real firearm. He insisted that he would never have brought a firearm to his work or to the school grounds, and countered that he did not currently own any firearm. He denied ever making the statement Neer attributed to him regarding buying rifles as a result of the Sandy Hook incident.

The police report concluded: "Based on all parties' statements, and the fact that this incident was late reported, I am unable to show evidence that Tucker had a real firearm during the original incident. . . . [T]here appears to be no merit to a criminal violation."

On August 6, 2013, Tucker sent emails to the NPAT Board detailing what he believed to be a conflict of interest that Scioli had with NPAT. This same day, Scioli wrote an email to the city council members, Cunningham, and NPAT Board members urging them to terminate Tucker's employment. He claimed Tucker lied and "horribly mismanaged" NPAT. He asserted that Tucker "manufactured" the story that Scioli had a conflict of interest "to take the emphasis away from the fact that he brought a loaded gun on school property . . . ." He explained that he had lunch with Cunningham and learned that she "was so concerned with Tucker having [*sic*] a loaded gun on campus, that she felt the need to contact the police as per school policy."

*NPAT's Budget and Finances*

During the summer of 2013, the District became aware of NPAT's cash flow problems. Karen Maloney, assistant superintendent for business and operations with the District, declared that Jennifer Frost, a District employee responsible for reconciling cash each month, brought to Maloney's attention that the NPAT account "was consistently

6

running negative . . . ." Maloney met with Tucker in September 2013, to review the NPAT budget. Tucker responded that "he was aware of the problem, and that NPAT's income was low because he had planned on providing summer camp, which didn't end up happening." Maloney's analysis of the budget indicated that NPAT's expenses exceeded its revenue.

### The Termination of Tucker's Employment

In October 2013, the NPAT Board voted to terminate Tucker's employment as the executive director of NPAT. Mayoral, the principal of Novato High School at that time, attended the meeting and observed that "[t]he driving factor behind" the NPAT Board's decision "was concern about mismanagement." He declared: "The Board was aware that Tucker was spending a lot of time playing golf rather than working on NPAT business. The Board had also been informed of allegations that items belong[ing] to NPAT were missing. The Board had heard a presentation . . . that NPAT was operating with a negative cash flow. Accordingly, the Board was concerned about mishandling of public funds." He concluded: "The gun allegations were mentioned in passing during the NPAT Board discussions regarding Tucker's termination, but this was not any part of my decision to vote to terminate Tucker's employment with NPAT. In addition, on information and belief, this was not a factor considered by the other NPAT Board members in reaching the decision to terminate his employment."

On November 21, 2013, the NPAT Board told Tucker that it was terminating his employment as the executive director of NPAT, effective in 60 days. The letter of termination did not provide any reasons.

### The Newspaper Articles

On December 13, 2013, the Novato Patch published an article entitled, "Novato Public Access Struggling to Stay Afloat Amid Budget Crisis, Layoffs." It stated in pertinent part: "Novato Public Access Television is in turmoil, with only $7,500 in available funds, an executive director recently fired, the studio closed and most employees laid off. [¶] . . . [¶] According to multiple sources familiar with the issue, the nonprofit regularly overspent, then relied on a loan from the school district to carry it

7

over until the next installment of cash from Comcast." The article quoted Mayoral as saying that " 'things stopped working' when Rick Tucker left Novato High about a year and a half ago and continued to disintegrate as NPAT struggled with resignations of various board members and dwindling funds."

The Marin Independent Journal published an article on December 16, 2013, entitled, "Novato Public Access runs out of money; board investigating finances." The article stated NPAT had been forced to suspend most of its operations because it had exhausted all of its operating funds. It noted that Tucker departed and the interim executive director was, according to Mayoral, "poring over invoices and financial records for the past five years 'to see where did this money go.' [¶] We're basically conducting an investigation right now,' said Mayoral, who joined the board two months ago. He said the board is working with the station's attorney and 'wrestling with some issues that are legal in nature.' But he declined to elaborate." The article provided: "Tax records for fiscal 2012 show that [NPAT's] expenses exceeded its total revenue of $192,191 that year by $2,291." In a clarification published January 15, 2014, Mayoral said he did not mean to use the word "investigation," and "didn't mean to imply that the former executive director did anything wrong."

*Tucker's Lawsuit*

On May 22, 2014, Tucker filed a complaint against defendants and others for, among other causes of action, defamation per se and defamation per quod.[2] Defendants demurred and on August 5, 2014, prior to the hearing on the demurrer, Tucker filed a first amended complaint.

In his claim for defamation per se, Tucker alleged that Cunningham falsely stated that he brought a firearm to the high school, that he was not professional, that he was sabotaging a colleague, and that he was not properly credentialed. He also alleged that Scioli sent a defamatory email falsely accusing him of, among other things, bringing a

---

[2] The other defendants were NPAT, Novato City, and Scioli. NPAT filed a cross-complaint against Tucker for conversion, constructive trust, and breach of express contracts.

loaded gun to campus, lying, bribery, and unprofessional conduct. He asserted that defendants published defamatory material about him in the Novato Patch and Marin Independent Journal regarding the mismanagement of funds. The defamatory publications, according to the first amended complaint, directly injured Tucker and his "personal, business, and professional reputation."

On October 3, 2014, defendants filed a motion to strike Tucker's two defamation causes of action under the anti-SLAPP statute. Tucker filed a motion to quash and asserted that the anti-SLAPP motion was untimely. The trial court denied this motion.

On November 12, 2014, the trial court filed its order denying the anti-SLAPP motion to strike Turner's two defamation claims.[3] The court explained: Defendants met "their initial burden of demonstrating that [Turner's] defamation claims arise, at least in part, from activity protected under the anti-SLAPP statute, namely statements about [Turner's] possessing a firearm on District property and statements to the new[s] media." The court found that, under the second prong, Turner demonstrated "a probability of prevailing on at least *one* of the asserted bases for liability, the firearm allegations. (*Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169, 1212.) [Turner] has made a sufficient prima facie showing that Cunningham's statements to Scioli and Mayoral concerning the gun incident were untrue and were motivated by malice. (*Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 413.)" The court did not rule on the various evidentiary objections raised by the parties.

Defendants filed a timely notice of appeal.

## DISCUSSION

### I. *Tucker's Statement of Facts*

In their reply brief, defendants object to the statement of facts presented in Tucker's opening brief. They argue that his brief violates appellate rules of procedure by omitting significant facts, including irrelevant facts, providing citations to the record that

---

[3] NPAT, Scioli, and Novato City filed joinders to the anti-SLAPP motion brought by defendants. The trial court denied their motions and they are not parties to this appeal.

do not support the factual assertions, and stating facts without any citation to the appellate record. (See Cal. Rules of Court, rule 8.204(a); *Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 166.)

Tucker's brief substantially complies with appellate procedure. With regard to all of the appellate briefs, we disregard all irrelevant facts, facts without citation to the record, or facts not supported by the appellate record. (See, e.g., *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768.)

## II. *Evidentiary Objections*

The trial court did not expressly rule on the numerous evidentiary objections defendants raised with their reply to Tucker's opposition to their anti-SLAPP motion. On appeal, defendants contend that the trial court was obligated to rule on their evidentiary objections when reviewing their anti-SLAPP motion. (*Hall v. Time Warner, Inc.* (2007) 153 Cal.App.4th 1337, 1347-1348.) They add that Tucker failed to mount any argument in the trial court or in this court countering their evidentiary objections and therefore he has waived any opposition to their objections. Defendants request this court to rule on their objections or, alternatively, reverse and remand for the trial court to rule on their evidentiary objections.

The trial court's failure to rule indicates that it overruled defendants' objections. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534 [in summary judgment context, objection not ruled on by trial court are preserved for appeal; objecting party has burden to renew objections in appellate court]; *Zucchet v. Galardi* (2014) 229 Cal.App.4th 1466, 1480, fn. 7.) Defendants did preserve this issue for appeal (see *Reid,* at p. 534), but they have failed to meet their burden of demonstrating that the trial court's implied overruling of their objections was error.

An appellant must prove that a trial court's rulings are incorrect "by presenting legal authority on each point made and factual analysis, supported by appropriate citations to the material facts in the record; otherwise, the argument may be deemed forfeited." (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655.) "One cannot simply say the [trial] court erred, and leave it up to the appellate court to figure out why." (*Niko v.*

10

*Foreman* (2006) 144 Cal.App.4th 344, 368.)  The appellate court need not furnish argument or search the record to ascertain whether there is support for appellant's contentions.  (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546.)

Here, defendants' opening appellate brief failed to make an argument to support any theory of evidentiary error.  In the trial court, defendants raised 63 objections, which cover 34 pages in the clerk's transcript.  In their opening appellate brief, they assert that we should rule on their objections and simply cite to two pages in the reporter's transcript where they argued before the trial court that they had "asserted numerous evidentiary objections" to declarations and that they had objected to Peabody's email.  Their opening brief provides absolutely no guidance as to whether they are challenging some or all of their 63 objections, and sets forth no legal argument to support their challenge to the trial court's presumed overruling of their objections.  California Rules of Court, rule 8.204(a)(1)(B) requires that each point must be supported by argument and, if possible, by citation of authority.  Defendants' failure to present any pertinent or intelligible legal argument in their brief constitutes an abandonment of an appeal based on evidentiary error. (See, e.g., *Salas v. California Dept. of Transportation* (2011) 198 Cal.App.4th 1058, 1074 [failure to demonstrate how each evidentiary ruling was erroneous constitutes a forfeiture of challenge].)

Defendants argue that Tucker failed to demonstrate that any of their objections lacked merit.  Tucker, however, does not have the burden of demonstrating that the trial court's ruling was correct.  As already noted, the trial court's failure to rule on the properly raised evidentiary objections implied that it overruled them; defendants, as the objecting parties, have the burden to demonstrate on appeal that this constituted error. (*Reid v. Google, Inc., supra,* 50 Cal.4th at p. 534.)

Defendants improperly raise for the first time in their reply brief legal arguments related to their evidentiary objections.  Argument in the reply brief deprived Tucker of an opportunity to respond.  Consequently, considerations of fairness demand that we disregard arguments made for the first time in the reply brief.  (See, e.g., *American Drug Stores, Inc. v. Stroh* (1992) 10 Cal.App.4th 1446, 1453.)

11

Accordingly, we conclude that defendants have abandoned any challenge to the trial court's implied evidentiary ruling.

### III. *The Denial of Defendants' Anti-SLAPP Motion*

### A. *The Anti-SLAPP Statute and Standard of Review*

Section 425.16, "commonly referred to as the anti-SLAPP statute," provides "for the early dismissal of unmeritorious claims filed to interfere with the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." (*Club Members for an Honest Election v. Sierra Club* (2008) 45 Cal.4th 309, 312, 315.) The statute provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) The Legislature has directed that the language of the statute be "construed broadly." (§ 425.16, subd. (a).)

Subdivision (e) of section 425.16 identifies four general categories of protected activities: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

To determine whether the plaintiffs' claims arise from protected acts, we "examine the *principal thrust* or *gravamen* of a plaintiff's cause of action to determine whether the anti-SLAPP statute applies. . . ." (*Ramona Unified School Dist. v. Tsiknas* (2005) 135 Cal.App.4th 510, 519-520.) We look to see whether the activity giving rise to the

complaint constitutes " '[t]he allegedly wrongful and injury-producing conduct . . . that provides the foundation for the claim[s]' " asserted in the lawsuit. (*Hylton v. Frank E. Rogozienski, Inc.* (2009) 177 Cal.App.4th 1264, 1272.) "In the anti-SLAPP context, the critical consideration is whether the cause of action is *based on* the defendant's protected free speech or petitioning activity. [Citations.]" (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 89.)

Where a cause of action is based on both protected and unprotected activity, it is subject to section 425.16 " 'unless the protected conduct is "merely incidental" to the unprotected conduct.' " (*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 672 (*Peregrine Funding*); see also *Haight Ashbury Free Clinics, Inc. v. Happening House Ventures* (2010) 184 Cal.App.4th 1539, 1553-1554 [entire cause of action properly stricken where any part is protected and not merely "incidental" to unprotected claim].)

Courts engage in a two-step, burden-shifting process in evaluating an anti-SLAPP motion. "First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity. The moving defendant's burden is to demonstrate that the act or acts of which the plaintiff complains were taken 'in furtherance of the [defendant's] right of petition or free speech under the United States or California Constitution in connection with a public issue,' as defined in the statute. (§ 425.16, subd. (b)(1).) If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.) Thus, "[o]nly a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech or petitioning *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute." (*Navellier v. Sletten, supra,* 29 Cal.4th at p. 89.)

"Review of an order granting or denying a motion to strike under section 425.16 is de novo. [Citation.] We consider 'the pleadings, and supporting and opposing affidavits . . . upon which the liability or defense is based.' (§ 425.16, subd. (b)(2).) However, we

13

neither 'weigh credibility [nor] compare the weight of the evidence. Rather, [we] accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.' [Citation.]" (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.) In performing our de novo review, we " 'conduct[ ] an independent review of the entire record. [Citations.]' " (*Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 672.) "[O]ur review is conducted in the same manner as the trial court in considering an anti-SLAPP motion. In determining whether the defendant . . . has met its initial burden of establishing that the plaintiff's . . . action arises from protected activity, we consider 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.' (§ 425.16, subd. (b)(2); [citations].) The second prong—i.e., whether the plaintiff . . . has shown a probability of prevailing on the merits—is considered under a standard similar to that employed in determining nonsuit, directed verdict or summary judgment motions. [Citation.] '[I]n order to establish the requisite probability of prevailing [citation], the plaintiff need only have " 'stated and substantiated a legally sufficient claim.' " [Citations.]' " (*Ibid.*)

## B. *Defendants Satisfied Their Prima Facie Burden*

As we noted in *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450 (*Hecimovich*), defamation is the very first of the " ' "favored causes of action in SLAPP suits." ' " (*Id.* at p. 464.) In the present case, Tucker's defamation claims are based on statements that Tucker possessed a firearm, was unprofessional, was "throwing Peter [Ornstein] under the bus," lacked a teaching credential, and mismanaged the NPAT. Defendants maintain that all of these statements are subject to the anti-SLAPP statute because these statements were connected with an issue of public interest (§ 425.16, subds. (e)(3) & (e)(4)), or an issue under consideration by a public body (*ibid.,* subd. (e)(2)).

"Like the SLAPP statute itself, the question whether something is an issue of public interest must be ' " 'construed broadly.' " ' [Citations.]" (*Hecimovich, supra,* 203 Cal.App.4th at pp. 464-465.) "An ' " 'issue of public interest' " ' is ' "*any issue in which*

14

*the public is interested.* ' ' [Citations.]  A matter of ' " 'public interest should be something of concern to a substantial number of people.  [Citation.]  . . .  [T]here should be some degree of closeness between the challenged statements and the asserted public interest [citation] . . . .'  '[T]he focus of the speaker's conduct should be the public interest. . . .' "  [Citation.]  Nevertheless, it may encompass activity between private people.'  [Citation.]"  (*Id.* at p. 465.)

Tucker alleged that Cunningham falsely told "third parties" that he brought a firearm to the high school.  A firearm brought onto the high school premises, where another student or person could have access to the gun, is related to the students' safety.  There can be no doubt that the safety of students at a public school is an issue of public interest.  (See *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1547 ["issue as to whether or not an adult who interacts with minors in a church youth program has engaged in an inappropriate relationship with any of the minors is clearly a matter of public interest"].)  "[T]he protection of children passes the threshold level of significance . . . ."  (*Id.* at p. 1549; see also *Hecimovich, supra,* 203 Cal.App.4th at pp. 467-468 [dispute between a fourth grade basketball coach and members of a parent teacher organization regarding parental complaints about the plaintiff's abrasive coaching style constituted an issue of public interest because "the safety of children in sports" is an issue of public interest].)

Tucker concedes that "gun safety in relation to children is hypothetically an issue of public interest," but asserts that Cunningham's statements to third parties "related to a single past event involving two or three people that was not likely to recur."  He cites *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913 (*Rivero*), and with little analysis, merely quotes, "the dispute between [David] Rivero and the employees he supervised was an isolated incident and was not part of a larger union dispute."  (*Id.* at p. 927.)

*Rivero, supra,* 105 Cal.App.4th 913, is clearly distinguishable from the present case.  In *Rivero,* a union's publication reported that a supervisor of eight custodians had been terminated for unlawful workplace activity.  The reviewing court held that the mere

fact these reports were widely disseminated to union members did not make them a public issue. (*Id.* at p. 926.) The remarks did not concern a matter of public interest because "the only individuals directly involved in and affected by the situation" were the supervisor and the eight employees. (*Id.* at p. 924.)

*Rivero, supra,* 105 Cal.App.4th 913 has been interpreted as outlining three general categories of cases falling within subdivision (e)(4) of section 425.16: "(1) The subject of the statement or activity precipitating the claim was a person or entity in the public eye. [Citations.] [¶] (2) The statement or activity precipitating the claim involved conduct that could affect large numbers of people beyond the direct participants. [Citations.] [¶] (3) The statement or activity precipitating the claim involved a topic of widespread public interest. [Citations.] [Citation.]" (*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 33.) Here, a school employee's showing a gun to a person at the school or at the District's parking lot and leaving the gun in an automobile parked on District property is conduct that could directly affect a large number of people beyond the direct participants. (See, e.g., *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468.)

The statements regarding Tucker's mismanagement of NPAT were also an issue of public interest. NPAT was a community station that covered city council meetings, football games, and other community programs. An article in the Novato Patch reported that programming on local television would probably not continue if NPAT were shut down. NPAT operated on public monies paid to the City of Novato by Comcast in exchange for its franchise.

Tucker argues that NPAT is a tiny nonprofit corporation, with only one full-time and three part-time employees, and there was no evidence that the firing of Tucker was an issue of widespread public interest. He claims that he had already been fired by the time the newspaper articles appeared in the press and no taxpayer dollars were included in the NPAT budget. He contends that the statements relating to his financial mismanagement did not arise "in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of

16

encouraging *participation* in matters of public significance." (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119 (*Du Charme*).) He claims the news articles were primarily about the firing of a private individual who was not in the public eye.

In *Du Charme, supra,* 110 Cal.App.4th 107, the appellate court held that the report at a union's website that an employee was removed for financial mismanagement was informational, but not of interest to the public at large. (See *id.* at p. 119.) When the issue is of interest to a limited portion of the public, the *Du Charme* court concluded that a topic of widespread public interest must "occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Ibid.*)

In contrast to the situation in *Du Charme*, here, the mismanagement of NPAT funds was not a purely private matter. As evidenced by the articles in the Novato Patch and Marin's Independent Journal, the mismanagement of NPAT funds potentially impacted the entire community's access to community programming, and it was unnecessary to show that it occurred in the context of an ongoing controversy, dispute, or discussion. (See *Morrow v. Los Angeles Unified School Dist.* (2007) 149 Cal.App.4th 1424, 1437 [court rejected argument that newspaper article's mention of principal's retirement was a purely private matter because the retirement plans were directly concerned with the school district's solution to the student violence].)

We conclude that the gun and financial mismanagement statements were issues of public interest. (§ 425.16, subds. (e)(3) & (e)(4).) We need not determine whether statements about Tucker's lack of professionalism, his throwing another colleague "under the bus," or his lack of credentials satisfied the anti-SLAPP statute. Even if those statements were not protected, the allegations that defendants defamed him by declaring and publishing that he brought a gun to the high school and mismanaged NPAT's financing were not merely incidental to the unprotected activity. These latter allegations represent the bulk of the allegations underlying the defamation causes of action. (See,

17

e.g., *Peregrine Funding, supra,* 133 Cal.App.4th at p. 673.)  Defendants thus met their prima facie burden of showing that Tucker's defamation claims arose from protected activity.

**C.  *Tucker Satisfied His Burden of Demonstrating a Probability of Prevailing***

**1.  *Tucker's Burden and the Elements of Defamation Torts***

To satisfy the second prong of the anti–SLAPP analysis, the plaintiff " ' " ' "must demonstrate the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment" ' " ' " if plaintiff's evidence is credited.  (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 695.)  Plaintiff need show only a "minimum level of legal sufficiency and triability." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 438, fn. 5.)

The tort of defamation " 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720, overruled on other grounds as stated in *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 380.)  Tucker's defamation causes of action were for both libel and slander.  (Civ. Code, § 44.) Defamatory publications that are made "by writing, printing, picture, effigy, or other fixed representation to the eye," are considered libel.  (Civ. Code, § 45.)  Slander involves defamatory publications that are "orally uttered[.]"  (Civ. Code, § 46.)

Tucker pleaded defamation per se and defamation per quod.  "Where a libelous [or slanderous] statement 'is defamatory *on its face,* it is said to be [defamation] per se, and actionable without proof of special damage.  But if it is defamation per quod, i.e., if the defamatory character is not apparent on its face and requires an explanation of the surrounding circumstances (the "innuendo") to make its meaning clear, it is not [defamatory] per se, and is not actionable without pleading and proof of special damages.' [Citations.]" (*Burrill v. Nair*, *supra*, 217 Cal.App.4th at p. 382.)  "[F]alse statements charging the commission of crime or tending directly to injure a plaintiff in respect to his or her profession by imputing dishonesty or questionable professional conduct are defamatory per se.  [Citations.]" (*Id.* at p. 383; see also, *Barnes-Hind, Inc. v.*

*Superior Court* (1986) 181 Cal.App.3d 377, 385 [false accusations of " 'dishonesty or questionable business methods' " are libel per se].)

When the plaintiff is a private person but the defamation involves a matter of public concern, as here, the plaintiff must prove the defendant made a statement to a third party; the third party reasonably understood the statement was about the plaintiff; the statements were reasonably understood to be defamatory; the statements were false; and the defendant failed to use reasonable care to determine the truth or falsity of the statements. (CACI Nos. 1702 & 1703.) "In general, each time the defamatory statement is communicated to a third person who understands its defamatory meaning as applied to the plaintiff, the statement is said to have been 'published[.]' " (*Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1242.)

## 2. *The Gun Statement*

Cunningham declared that she told Scioli on June 18, 2013, that "Neer had reported seeing Tucker in possession of a gun in the NPAT/DISTRICT parking lot." Scioli's email on August 6, 2013, to the NPAT Board urging the termination of Tucker's employment stated that "[he] had lunch with . . . Cunningham . . . and learned that she was so concerned" that Tucker had brought "a loaded gun on campus, that she felt the need to contact the police as per school policy." Scioli claimed that Tucker had "manufactured" a story that Scioli had a conflict of interest with NPAT "to take the emphasis away from the fact that he brought a loaded gun on school property . . . ." These statements support an inference that Cunningham told Scioli that Tucker brought a loaded gun onto school property.

Bringing a firearm to a school campus is a crime (Pen. Code, § 626.9), and, as noted, each publication of the defamatory statement "gives rise to a new cause of action for defamation." (*Shively v. Bozanich, supra,* 31 Cal.4th at p. 1242.) Thus, when Scioli republished Cunningham's comments in his email and said that Tucker brought a

19

"loaded" gun on campus, Cunningham was liable for this republication.[4]  When making these comments, Cunningham was acting within the scope of her employment and the District is liable for her defamation under respondeat superior.  (Gov. Code, § 815.2.)

Defendants are liable for defamation only if Tucker can prove that the loaded gun statements were false.  (*Taus v. Loftus, supra,* 40 Cal.4th at p. 720.)  "[T]he defendant need not justify the literal truth of *every word* of the allegedly defamatory matter.  It is sufficient if the *substance* of the charge is proven true, irrespective of slight inaccuracy in the details, 'so long as the imputation is substantially true so as to justify the "gist or sting" of the remark.' "  (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1180-1181 (*Ringler*).)  "Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the [listener] from that which the pleaded truth would have produced.' "  (*Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 517.)  However, "even if a statement is literally accurate, defamation may be proven if it has a false implication."  (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 293.)

Tucker presented prima facie evidence that the statement that he brought a loaded gun onto school property was false.  Both Fix and Tucker declared that the gun at issue was a toy.  Fix stated that it was obvious to him that the gun was a toy and he had knowledge concerning guns since he had been in the military for more than two years.  Additionally, the investigating police officer was unable to garner "evidence that Tucker had a real firearm during the original incident. . . ."

Defendants assert that it was immaterial that the gun was a toy because the gun statement was substantially true.  (See *Ringler, supra,* 80 Cal.App.4th at pp. 1180-1181.)  They maintain that it is undisputed that Tucker possessed "a gun of some sort on District property."  They claim the record is devoid of any evidence that Neer's statement that she saw Tucker with a gun was false.

---

[4]  Tucker agrees that Cunningham's statement to the police was absolutely privileged.  (Civ. Code, § 47, subd. (b).)

We agree that Cunningham's statements contained some truths. It is undisputed that Tucker brought some type of gun to the District's parking lot. Scioli's email indicates that Cunningham implied or declared that it was a fact that Tucker brought a real gun or a loaded firearm to the campus. A statement that a gun is a toy or that it could have been a fake has a completely different effect on the mind of a listener than a statement that a gun was real or loaded. Whether a gun is real or fake is not a slight inaccuracy or omission, but goes to the substance of the charge. It is illegal to bring a real firearm onto the campus; it is not illegal to bring a fake gun onto campus. A statement that avows or clearly implies by omission that a firearm was unquestionably real or loaded is actionable if it conveys false or defamatory information. (See, e.g., *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 902-903 (*Wilbanks*).)

Tucker also presented evidence that defendants failed to use reasonable care to determine the truth or falsity of Neer's gun statements. Neer waited nearly a month to tell Cunningham about the incident, which supported an inference that Neer's accusation was questionable or false. Tucker emphasizes that "the fact that this incident was late reported," was one of the reasons the police investigator could not determine whether Tucker had a real firearm on the District's parking lot.

Tucker's argument that Cunningham was negligent in making the gun statements is, according to defendants, "contingent on [Tucker's] showing that Cunningham knew that Neer was 'hostile' toward Tucker." They maintain that Tucker failed to show that Cunningham knew that Neer was hostile toward him; nor did he counter their evidence that Cunningham believed the gun statements were true. The only evidence supporting negligence was, according to defendants, Tucker's self-serving statement that Cunningham and Neer were "acting in concert to tarnish" his reputation.

Tucker did not have to submit evidence that Cunningham knew Neer's statement was false or that she knew Neer was hostile toward Tucker. Rather, he had to present evidence that Cunningham knew or should have known that Neer had a motive to lie or exaggerate. He satisfied this burden by submitting the email Neer sent on June 19, 2013, the day after she reported the gun incident to Cunningham. Neer sent this email to the

21

Board and Scioli, and she copied Cunningham. In the email, Neer wrote that Tucker had not paid her for her work and that he had terminated her employment after she pointed out his poor business practices and inability to pay her in a timely fashion. This email also repeated her assertion that in late May she saw him with a "Nazi pistol without a safety lock in the District parking lot . . . ." This email put Cunningham on notice that Neer had a motive to lie about Tucker since he had terminated her employment contract. This email also confirmed that there was some tension between Neer and Tucker.

Cunningham accepted Neer's gun statement as true without any investigation. Cunningham told the investigating officer that she spoke with Tucker about Neer's financial claims, but there is no evidence that she ever mentioned the firearm accusation to Tucker or provided him with any opportunity to refute it.

Defendants argue that Cunningham had no duty to investigate. However, since Cunningham knew or had reason to know that there was tension between Neer and Tucker, her failure to discuss Neer's accusations with Tucker before publishing the material could give rise to an inference that she "acted . . . negligently, and quite possibly with a reckless disregard for the truth." (See *Wilbanks, supra,* 121 Cal.App.4th at p. 906 [maintaining a website advising readers that plaintiff was incompetent and under investigation by the state department of insurance raised an inference of negligence because there was no attempt to check with plaintiff before publishing material].) A refusal to discuss the claim with the plaintiff "could be viewed as demonstrating a lack of interest in the truth." (*Ibid.*, see also *Fisher v. Larsen* (1982) 138 Cal.App.3d 627, 639-641 (*Fisher*).)

Accordingly, we conclude that Tucker made a prima facie case of showing that the gun statements satisfied the essential elements of a claim of defamation.

**3. *Common Interest Privilege***

In order to meet his burden, Tucker must overcome Defendant's substantive defenses. (*Hecimovich, supra,* 203 Cal.App.4th at p. 472.) Here, defendants asserted the "common interest" privilege. (Civ. Code, § 47, subd. (c).)

22

"Civil Code section 47, subdivision (c) provides a conditional privilege for communications made 'without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information.' " (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 108.)  To defeat the privilege Tucker had to make a prima facie showing of defendants' " 'actual malice.' " (*Hailstone v. Martinez* (2008) 169 Cal.App.4th 728, 740.)

Actual malice "is established [1] by a showing that the publication was motivated by hatred or ill will toward the plaintiff or [2] by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights.  [Citation.]  However, the lack of reasonable grounds requires more than mere negligence.  Malice is shown only when the negligence amounts to a reckless or wanton disregard for the truth, so as to imply a willful disregard for, or avoidance of, accuracy." (*Hailstone v. Martinez, supra,* 169 Cal.App.4th at p. 740.)  Actual malice may be shown by evidence that defendants knew the gun statements were false or entertained serious doubts about their veracity.  (See *Wilbanks, supra,* 121 Cal.App.4th at p. 906.)

A claim by a defendant that the statements were made in good faith that they were true does not automatically prevent a finding of malice.  (*Fisher, supra,* 138 Cal.App.3d at p. 640.)  " '[A]ctual malice' may be inferred when the investigation was grossly inadequate under the circumstances." (*Ibid.*)  "Where the information is from a source known to be hostile to the subject against whom the material is to be used, failure to investigate the truth of allegations solely received from this source may support a finding the publication has been made in wanton and reckless disregard of veracity." (*Ibid.*)

Tucker met his burden of presenting prima facie evidence of Cunningham's malice.  As noted, Cunningham did not investigate the veracity of Neer's statement.  Cunningham's failure to conduct even a rudimentary investigation given that she knew or had reason to know about the conflict between Neer and Tucker supported an inference

23

of Cunningham's actual malice. Furthermore, Tucker presented evidence indicating that Cunningham had actual malice toward him. According to the police report, Cunningham told the police officer that Tucker was "a 'pathological liar,' who may suffer from a mental illness or an anger management issue. . . ." She stated, "Many [District] staff members refuse to work with [Tucker], and he easily gets angry when confronted about issues." She acknowledged that "her relationship with Tucker became strained when she cancelled an NPAT contract . . . ."[5]

We thus conclude that Tucker, "through a showing of minimal merit, has stated and substantiated a legally sufficient claim" (see *Wilbanks, supra,* 121 Cal.App.4th at p. 906) based on the gun statements.

### 4. *Other Statements*

"When a cause of action states multiple grounds for relief, 'the plaintiff may satisfy its obligation in the second prong by simply showing a probability of prevailing on any' one of those grounds." (*Bently Reserve L.P. v. Papaliolios* (2013) 218 Cal.App.4th 418, 426.) Since we have concluded that Tucker met his burden of showing a probability of prevailing on his defamation claims based on the statements regarding the gun, we need not consider his additional claims for relief based on statements that he was not being professional, was throwing another colleague "under the bus," was financially mismanaging NPAT, and was not teaching because he lacked the necessary credential.[6]

---

[5] Civil Code section 47, subdivision (c) bars any defamation claim based on the statements made to the police officer but these statements may be used for evidentiary purposes in determining whether the individual acted with malice. (See *Oren Royal Oaks Venture v. Greenberg, Bernhard, Weiss & Karma, Inc.* (1986) 42 Cal.3d 1157, 1168.)

[6] Defendants filed their anti-SLAPP motion more than 130 days after they were served with Tucker's original complaint, and Tucker argues that an independent basis for affirming the motion was untimely. (See § 425.16, subd. (f) ["[t]he special motion may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper"].) Tucker concedes that defendants filed their anti-SLAPP motion within 60 days of his filing of his amended complaint, and acknowledges the cases that hold such a SLAPP motion timely. (See, e.g., *Yu v. Signet*

24

**DISPOSITION**

The order denying the special motion to strike Tucker's two defamation claims under section 425.16 is affirmed. Tucker is awarded the costs of appeal.

---

*Bank* (2002) 103 Cal.App.4th 298, 314.) Tucker argues that such rule should not be automatically applied, but only if the Amendment adds "*newly pleaded* causes of action arising from protected conduct." (*Hewlett-Packard Company v. Oracle Corp.* (2015) 239 Cal.App.4th 1174, 1192, fn. 11.)

Tucker maintains that this amendment did not relate to the causes of action in his original complaint subject to the anti-SLAPP motion, and that permitting the 60-day limitation to be triggered by his amended complaint defeats the "two potential purposes" of the 60-day limitation, which are "to require presentation and resolution of the anti-SLAPP claim at the outset of the litigation before the parties have undertaken the expenses of litigation that begin to accrue after the pleading stage of the lawsuit[, and] to avoid tactical manipulation of the stays that attend anti-SLAPP proceedings." (*Olsen v. Harbison* (2005) 134 Cal.App.4th 278, 287.)

We are aware of possible abuses of the SLAPP process that cause unnecessary delay (see generally *Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 988-989), and are therefore tempted to address this issue. However, the record below is not clear, and, so far as we know, perhaps complicated by a stipulation for an amendment. In any event, since we are affirming the trial court's ruling on a different basis, we decline to address the merits of Tucker's timeliness argument.

                                                _____
                                                Kline, P.J.


We concur:


_____
Richman, J.


_____
Miller, J.


*Tucker v. Cunningham* (A143960)